E-FILED
Monday, 23 March, 2026 10:32:25 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| RICKY PATTERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 21-4198 |
| | ) | |
| STEPHANIE DORETHY, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## SUMMARY JUDGMENT ORDER

Plaintiff, then proceeding pro se, brought the present lawsuit pursuant to 42 U.S.C. § 1983, alleging Eighth Amendment failure-to-protect, Fourteenth Amendment procedural due process, and First Amendment retaliation claims. The matter comes before this Court for ruling on the Defendants' Motion for Summary Judgment. (Doc. 151). The motion is granted.

## PRELIMINARY MATTERS

### Defendants' Motion for Leave to Address Administrative Exhaustion (Doc. 153)

Defendants seek leave to address the issue of failure to exhaust administrative remedies in their motion for summary judgment. Plaintiff does not object. The motion is granted. The Court addresses the issue below.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts must be construed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in his favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). The party moving for summary judgment must show the lack of a genuine issue

of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## FACTS[1]

Plaintiff was incarcerated at Hill Correctional Center. (Doc. 1 at 7). Defendants worked at the facility in the following capacities: Defendant Dorethy was the warden; Defendant McLaughlin was the assistant warden; Defendants Williams and Stuart were correctional lieutenants; Defendants Frost and Schultz were correctional counselors; Defendant Fryrear was an Internal Affairs officer; Defendants Range and Cohill[2] were correctional officers; Defendants Trembly and Haase were placement officers; and, Defendant Ganahl was a correctional major.[3] Pl.'s Dep. 9:9-10:15.

Housing decisions are made by officials in the Placement Office after considering several factors, including but not limited to inmates' respective disciplinary histories and institutional objectives. Williams Dep. 23:6-12, 27:14-15; Stuart Dep. 38:15-18, 39:7-12. An inmate unhappy with a housing assignment may submit a request to be moved to the Placement Office. UMF 1.

---

[1] Plaintiff did not respond to the facts asserted in Defendants' motion in the manner required under the federal and local rules. *See* Fed. R. Civ. P. 56(c); CDIL L.R. 7.1(D)(2)(b). Plaintiff did not remedy this defect after Defendants pointed it out in their reply brief, and the Court granted Plaintiff leave to amend his response. *See* (Doc. 158); Text Order entered Feb. 24, 2026. The Court considers the facts asserted in Defendants' motion as undisputed for purposes of this ruling. Fed. R. Civ. P. 56(e)(2); CDIL L.R. 7.1(D)(2)(b)(6). The Court also considers other evidence in the record to the extent necessary. Fed. R. Civ. P. 56(c)(3) (court may consider materials in the record other than those not cited); *but see Zoretic v. Darge*, 832 F.3d 639, 641 (7th Cir. 2016) ("[N]either appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes.").

[2] Also referenced in the record as Cohill-Taylor and Taylor.

[3] Defendant Ganahl has not filed an answer, nor is she currently represented. The Court discusses the procedural posture of the claims against this defendant in a separate section below.

The request must state the reasons for the request, and, if denied, an inmate may challenge the decision via the grievance process. *Id.*

Verbal requests to be moved are sufficient in an emergency that requires immediate relocation. UMF 3. These types of requests are addressed through the normal chain of command (housing unit officer, sergeant, lieutenant, etc.), but if in response to a bona fide emergency, the sergeant may contact the Placement Office directly. *Id.* An inmate may refuse housing to effect an immediate cell change, but doing so results in the loss of privileges and potential disciplinary action if the Adjustment Committee finds that the inmate was not justified in doing so. UMF 2. Inmates often requested new housing assignments, citing concerns about their safety. Sparfven Dep. 20:4-14; Dorethy Dep. 17:2-6.

Prison officials housed Plaintiff in a cell with inmate Hodge on June 3, 2019. UMF 5. Plaintiff did not know inmate Hodge before he was assigned to share a cell with him. Pl.'s Dep. 18:20-22. The record does not disclose which defendant, if any, made the decision to house Plaintiff with inmate Hodge on that date.

Plaintiff testified at his deposition that, during the first night in the cell, inmate Hodge "kept waking me up, asking me did I steal his shoes…I remember him sleeping really…just being in the bed really weird…[h]e thought that I took something from him. He thought I was a plant in his cell." *Id.* 24:3-9. Plaintiff stated in his verified complaint that this behavior caused him to become "so afraid he laid awake all night with his back against the wall waiting to be attacked." (Doc. 1 at 8).

Plaintiff conveyed his concerns to an unidentified correctional officer the next morning. who referred him to Sergeant Sparfven. *Id.* Sergeant Sparfven testified that Plaintiff "asked to speak with me, told me that him and his cellmate Hodge weren't seeing eye to eye, that he

thought [Hodge] had mental health issues…and that he would like to be moved because he thought it was going to come to a confrontation." Sparfven Dep. 11:20-25. Sparfven testified that he had no prior knowledge of Plaintiff's and inmate Hodge's disciplinary or mental health history or knowledge of any past disputes between the two. *Id.* 14:3-9; 22:24-23:2. Sparfven testified that he would not have been provided this information prior to an inmate being housed in his assigned area. *Id.* 14:24-15:2.

Sparfven told Plaintiff that he would contact the placement office to inquire about moving Plaintiff to a different cell. (Doc. 162-1 at 2). He did not interview or speak with inmate Hodge about Plaintiff's concerns because he feared doing so "would…tell Hodge that Patterson was complaining about him and I didn't want to escalate it further that way." Sparfven Dep. 23:19-21. Later that day, at approximately 2:00-2:30 p.m. when Plaintiff returned from school, Sparfven told Plaintiff that officials in the placement office had told him that moving Plaintiff required the warden's approval. (Doc. 162-4 at 4). Sparfven does not remember the placement official with whom he spoke. Sparfven Dep. 12:2-3.

Sparfven then contacted Defendant Williams, the zone lieutenant[4] on duty at the time. (Doc. 162-1 at 2). Defendant Williams testified at her deposition that she had no prior knowledge of Plaintiff's or inmate Hodge's disciplinary backgrounds, and that she would not have been provided that information ahead of time. Williams Dep. 27:14-18. She testified that, if known at the time, their respective histories as presented at her deposition would not have indicated an inherent risk of harm because both were consistent with the backgrounds of most inmates. *Id.* 24:20-25:25, 28:2-3, 28:25-29:19.

---

[4] Hill is divided into zones for security purposes. Williams Dep. 10:13-20. A lieutenant usually supervised one or two zones. *Id.* 10:21-25.

Defendant Williams testified that she does not remember the interaction with Plaintiff on June 4, 2019, but Sparfven testified that Defendant Williams contacted the placement office once advised of Plaintiff's situation. Williams Dep. 24:7-9; Sparfven 17:23-18:2, 19:10-19. Sparfven testified that unidentified placement officials also told her that moving Plaintiff required the warden's approval. Sparfven Dep. 19:16-19. Sparfven and Defendant Williams thereafter told Plaintiff that he could refuse housing and be moved to segregation or to the area of the prison that housed inmates who refused housing. (Doc. 162-1 at 3). Plaintiff declined. UMF 7. He asserts prison officials never spoke with inmate Hodge. (Doc. 162-4 at 5). Sparfven testified that he and Defendant Williams left the prison at 3:00 p.m. Sparfven Dep. 12:23.

Plaintiff states that a non-defendant sergeant made an unprompted visit to his cell during the 3pm-11pm shift to "see if I was okay." (Doc. 162-4 at 5). The official told Plaintiff to speak with Lieutenant Gibbs after Plaintiff said he was okay. *Id.* at 5. Plaintiff later told Lieutenant Gibbs that he was okay with staying in the cell until the next day when he could be moved. UMF 6; (Doc. 162-4 at 5).

Prison officials found inmate Hodge in the cell at approximately 9:05 p.m. covered in blood, breathing heavily, and with visible wounds all over his face. UMF 8. According to the incident reports, officials saw Plaintiff shortly thereafter standing at a nearby table in the dayroom wearing shorts covered in blood. (Doc. 152-5 at 9). Plaintiff later admitted to fighting with inmate Hodge, but he denied starting the fight. *Id.* at 12. Officials took him to segregation and placed him on investigative status. UMF 10.

Plaintiff submitted an emergency grievance dated June 3, 2019, regarding the cell assignment and describing his interactions with Sparfven and Defendant Williams on June 4, 2019. (Doc. 162-4 at 1-2). Notations on the grievance indicate that Defendant Dorethy received

it on June 6, 2019, and denied Plaintiff's request for expedited review the same day. *Id.* at 1. He submitted an additional grievance dated June 5, 2019, describing the altercation. *Id.* at 3-5. The grievance contains no indication that officials at Hill received it, but a counseling summary indicates that the counselor received it on June 17, 2019. *Id.*; (Doc. 162-4 at 20).

On June 27, 2019, officials issued Plaintiff a disciplinary ticket for fighting based upon a disciplinary report Defendant Fryrear issued and upon which Defendants Kersh and Stewart had signed off. UMF 11, 12. Defendant Cohill served the ticket on June 28, 2019, by placing it on the outside of Plaintiff's cell door. (Doc. 152-5 at 16); Pl.'s Dep. 41:21-22. The prison rules define the offense of fighting as "[f]ighting with another person in a manner that is not likely to cause serious bodily injury to one or the other and that does not involve the use of a weapon." (Doc. 152-3 at 106).

Defendants Stuart and Range found Plaintiff guilty of the offense of fighting at a July 4, 2019, hearing in their capacities as members of the Adjustment Committee. UMF 14, 16. Before doing so, they permitted Plaintiff an opportunity to make a statement in his defense. UMF 15. Plaintiff suggested in his deposition testimony that he had sent documents to the Adjustment Committee requesting "all staff who dealt with [Hodge] before" to be called as witnesses, but the record does not indicate that the Adjustment Committee received those requests or heard witness testimony at the hearing. Pl.'s Dep. 43:2-24. Plaintiff received a written statement outlining the reasons why they found him guilty. UMF 18. The Adjustment Committee recommended one month C grade, 1 month segregation, and 1 month commissary restriction. UMF 16. Defendant Dorethy signed off on the punishment. UMF 18.

Plaintiff does not recall speaking or sending written correspondence to Defendant McLaughlin, Frost, Fryrear, Kersh, or Schultz about these events. UMF 23-27.

## ANALYSIS

### Failure to Exhaust Administrative Remedies

Defendants argue that Plaintiff admitted in his complaint that he did not exhaust his administrative remedies. Plaintiff's complaint stated that he did not complete the grievance process because "defendants have refused to provide answer in two years and have prevented Plaintiff from seeking remedy at next level in order to complete process." (Doc. 1 at 6).

The Prison Litigation Reform Act requires only that inmates exhaust available remedies. *See Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) ("An inmate…must exhaust available remedies, but need not exhaust unavailable ones."). Viewed in the light most favorable to Plaintiff, and absent evidence that the process remained available, Plaintiff's statement permits only the inference that administrative remedies became unavailable. *Smallwood v. Williams*, 59 F.4th 306, 315 (7th Cir. 2023) (defendants bear the burden of showing that a prisoner failed to exhaust all available remedies, not on a prisoner to show that the remedies were unavailable). The Court finds that Plaintiff exhausted all available administrative remedies.

### Failure to Protect

Prison officials violate the Eighth Amendment when they act with deliberate indifference to "an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The risk of harm to which the prisoner was subjected must be objectively serious. *Sinn v. Lemmon*, 911 F.3d 412, 419 (7th Cir. 2018). "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843.

A prison official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* A plaintiff "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Gevas v. McLaughlin,* 798 F.3d 475, 480 (7th Cir. 2015) (citations omitted). Generalized, vague, or stale concerns about one's safety typically will not suffice. *Id.* at 480-81. Prison officials with knowledge of an objectively serious risk cannot be held liable if they responded reasonably, even if the harm was ultimately not averted. *LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. 2020).

A plaintiff may not hold an official liable under § 1983 just because that official may have been in charge. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (no *respondeat superior* liability under § 1983); *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) ("Liability [under § 1983] depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise."). "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996).

Multiple defendants testified that inmates at Hill often sought new cell assignments by conveying fears of attack. The Seventh Circuit acknowledged in *Riccardo v. Rausch* the difficulty prison officials face in these types of situations:

> Some prisoners are manipulative and cry "wolf" in an effort to have a cell to themselves or choose a favored cellmate. Other prisoners perceive specters in every shadow, even though their fears are unsupported…Guards therefore must discriminate between serious risks of harm and feigned or imagined ones, which is not an easy task given the brief time and scant information available to make each of the many decisions that fill every day's work.

375 F.3d 521, 525 (2004). Therefore, the Eighth Amendment requires only that prison officials respond reasonably to any risk of harm that may exist. *Id.*; *LaBrec*, 948 F.3d at 841.

Plaintiff relies heavily on the fact that Defendant Williams offered him the option to refuse housing to argue that she forced him to choose between his personal safety and the loss of privileges this option would entail, and, had she not done so, the subsequent altercation would not have occurred. Plaintiff argues further that the Seventh Circuit invalidated this policy in *Gevas v. McLaughlin*, and that Defendants McLaughlin and Dorethy should accordingly be held liable for the creation of the prison directive that authorized this option.

In *Gevas*, the plaintiff conveyed that another inmate "threatened on a daily basis to stab him, saying that [he] was 'not too big to bleed' and 'not too big to be beaten up.'" *Id.* at 478. Letters he sent to prison officials also conveyed that the inmate had labeled the plaintiff as a snitch. *Id.* The defendants in that case told the plaintiff he could refuse housing as a last resort before it was clear to the plaintiff that officials would take no further action. *Id.* at 483. The Seventh Circuit held that prison officials could not escape liability (at least within the context of a Rule 50 motion) by transferring their obligation to take reasonable steps to address serious risks of harm to the prisoner "by insisting that he go so far as to engage in insubordination in order to take himself out of danger." *Id.* at 484.

This case presents a different situation. Plaintiff's subjective fears were based upon one incident where inmate Hodge had accused him of stealing his shoes without indication that inmate Hodge had made any physical or verbal threats of harm. The record discloses no prior history between the two, and neither Sparfven, nor Defendant Williams, were privy to their respective mental health or disciplinary histories on June 4, 2019. Sparfven's testimony that Defendant Williams contacted the placement office once advised of the situation is not refuted,

Page **9** of **15**

and the parties do not dispute that officials in the placement office were solely responsible for the initial cell assignment and later refusal to move Plaintiff to a new cell.

Plaintiff's statement that an official on the next shift made an unprompted visit to his cell to check on his well-being permits only the inference that either Sparfven or Defendant Williams had advised officials on that shift of the issues Plaintiff had presented. Plaintiff's statement to Lieutenant Gibbs that he was "okay" staying in the cell one more night suggests that any risk of harm Plaintiff perceived did not require immediate removal or that it had abated since his conversation with Defendant Williams. At the very least, it breaks any causal connection between Defendant Williams' conduct and the altercation that occurred. *Nielson v. Sexton*, --- F.4th ---, 2026 WL 538015, at *6 (7th Cir. 2026) (causation element of Eighth Amendment failure-to-protect claim "is evaluated in line with ordinary tort principles and requires both factual and proximate causation.").

The record does not permit a reasonable inference that Defendant Williams' decisions to contact the placement office, to advise Plaintiff of any available options when that effort failed, and to apparently notify the next shift were unreasonable under the circumstances or deliberately indifferent. Plaintiff cannot hold Defendant Williams liable for the placement office's decisions regarding his cell placement, for her alleged failure to follow any prison rules that required an investigation into Plaintiff's concerns, or for her failure to assume duties assigned to other officials. *Burks*, 555 F.3d at 595 ("[N]o prisoner is entitled to insist that one employee do another's job."); *Rossi v. City of Chicago*, 790 F.3d 729, 735 (7th Cir. 2015) (no constitutional right to an investigation); *Guarjardo-Palma v. Martinson*, 622 F.3d 801, 806 (7th Cir. 2010) ("[A] violation of state law is not a ground for a federal civil rights suit.").

Plaintiff cannot hold Defendant Dorethy, Defendant McLaughlin, or other supervisory defendants liable just because they were in charge. The record does not permit a reasonable inference that any other defendant knew about Plaintiff's issues before the altercation occurred, and any involvement in the grievance process after the fact is not sufficient to impose constitutional liability. *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007).

The record discloses that officials in the placement office were responsible for Plaintiff's cell assignment and the only officials who presumably had prior knowledge of any relevant disciplinary or mental health history. The record indicates that Defendants Trembly and Haase were assigned to the placement office, but the record does not contain any evidence permitting a reasonable inference that either of these defendants were personally involved in any of Plaintiff's housing decisions. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) ("Once a party has made a properly supported motion for summary judgment, the nonmoving party may not simply rest upon the pleadings but must instead submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." (cleaned up)). The Court finds that no reasonable juror could conclude that Defendants violated Plaintiff's Eighth Amendment rights.

### Procedural Due Process

To prevail on a Fourteenth Amendment procedural due process claim arising from a prison disciplinary proceeding, "an inmate must demonstrate (1) a constitutionally protected liberty interest and (2) deficient procedures attendant to the deprivation of that interest." *Ealy v. Watson*, 109 F.4th 958, 964 (7th Cir. 2024). Punishment that affects the duration of confinement, such as the loss of good-time credits, implicates a protected liberty interest on its own accord. *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007). Other punishment, including disciplinary segregation, constitutes a protected liberty interest only if it resulted in "an atypical and

significant hardship on the inmate in relation to the ordinary incidents of prison life." *Ealy*, 109 F.4th at 964 (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). The "atypical and significant hardship" standard is "dependent on the combined duration and conditions of confinement," viewed in light of "all circumstances of a prisoner's confinement." *Torres v. Brookman*, 155 F.4th 952, 956 (7th Cir. 2025).

If a protected liberty interest exists, a prisoner is entitled to: "(1) advance (at least 24 hours before hearing) written notice of the claimed violation; (2) the opportunity to be heard before an impartial decision maker; (3) the opportunity to call witnesses and present documentary evidence (when consistent with institutional safety); and (4) a written statement by the fact-finder of the evidence relied on and the reasons for the disciplinary action." *Ealy*, 109 F.4th at 965 (citing *Scruggs*, 485 F.3d at 939). Otherwise, inmates facing disciplinary segregation are entitled to "informal due process" that requires only: "(1) notice of the reasons for the inmate's placement in segregation and (2) an opportunity to present his views, for instance, in a written statement or at a hearing." *Id.* at 966 (internal quotations omitted).

Plaintiff's detention in segregation pending an investigation into the June 4, 2019, incident did not violate his procedural due process rights. *See Holly v. Woolfolk*, 415 F.3d 678, 680 (7th Cir. 2005) (confinement in segregation pending investigation into rule violation does not offend due process). Plaintiff does not allege that the conditions in segregation were unduly harsh or inhumane, and the temporary reduction in status and loss of privileges is not the type of "atypical and significant" deprivation required to trigger due process concerns. *See Croom v. Schoenbeck*, 2025 WL 957898, at *2 (7th Cir. 2025) (three months in segregation with recreation twice a week, no tablet or television, no commissary, and no cleaning supplies did not implicate

liberty interest). Plaintiff was entitled only to the "informal" due process afforded to inmates sent to segregation.

Plaintiff received any process he was due under either scenario. Plaintiff received notice of the hearing, he was granted the opportunity to present his defense before prison officials who were not involved in the underlying incident, and he received a written statement outlining the reasons for the decision. Plaintiff's admission that he was involved in the altercation provides sufficient support for the Adjustment Committee's findings. *Torres*, 155 F.4th at 957 ("[T]he disciplinary decision must be "supported by some evidence in the record." (quoting *Superintendant, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985)).

Assuming Plaintiff submitted a request for witnesses, the witnesses Plaintiff identified at his deposition would not have offered any insight into the altercation itself because it occurred in the cell with only Plaintiff and inmate Hodge present, and prison officials' prior interactions with inmate Hodge would have had no relevance to the rule infraction at issue. *Piggie v. Cotton*, 344 F.3d 674, 677 (7th Cir. 2003) (no right to call witnesses at disciplinary hearing whose testimony would be irrelevant, repetitive, or unnecessary). Defendants Stuart and Range were thus not required to call these witnesses to satisfy due process. *Torres*, 155 F.4th at 959 (inmate facing segregation was not entitled to explanation for refusal to hear witness testimony).

The record does not permit a reasonable inference that Plaintiff suffered the requisite deprivation or that prison officials failed to provide any process that was due. The Court finds that no reasonable juror could conclude that Defendants violated Plaintiff's Fourteenth Amendment procedural due process rights.

**Retaliation**

Plaintiff concedes in his first response to Defendants' motion for summary judgment that his retaliation claim cannot survive summary judgment. (Doc. 156 at 1). The Court finds that no reasonable juror could conclude that Defendants violated Plaintiff's First Amendment rights.

**Defendant Ganahl**

After several attempts to obtain an executed waiver of service from Defendant Ganahl, the Court effected service via the U.S. Marshals Service. (Doc. 126). Defendant Ganahl did not appear or file an answer by the required deadline. Text Order entered Nov. 14, 2024. Shortly thereafter, an attorney filed an appearance on Plaintiff's behalf. (Doc. 132). Plaintiff did not take any further action regarding this defendant.

Insofar as the Court can determine, Defendant Ganahl's only involvement in the events giving rise to Plaintiff's claims was signing off on Lieutenant Gibbs' report regarding the altercation. (Doc. 156-6 at 1). Pursuant to Fed. R. Civ. P. 56(f), the Court is inclined to enter summary judgment in Defendant Ganahl's favor because she was not personally involved in any alleged deprivation and Plaintiff cannot hold her liable just because she held a supervisory position. The Court will grant the parties an opportunity within the deadline set forth below to submit any argument or authority for or against entry of summary judgment in favor of this defendant. If the parties do not respond, the Court will grant summary judgment in Defendant Ganahl's favor.

**IT IS THEREFORE ORDERED:**

1) **Defendants' Motion for Leave [153] is GRANTED.**

2) **Defendants' Motion for Summary Judgment [151] is GRANTED. Clerk is directed to terminate Defendants Dorethy, McLaughlin, Williams, Stuart, Range, Frost, Schultz, Fryrear, Trembly, Kersh, Stewart, Taylor, and Haase.**

Page **14** of 15

3) **The parties shall submit any argument or authority for or against entry of summary judgment in favor of Defendant Ganahl within 7 days of this Order.**

Entered this 23rd day of March, 2026.

_s/Sara Darrow_

SARA DARROW
UNITED STATES DISTRICT JUDGE